COMMONWEALTH *vs.* MICHAEL WOODS.

Suffolk. September 11, 1980. — November 20, 1980.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, WILKINS, & LIACOS, JJ.

*Rape. Practice, Criminal,* Directed verdict, New trial, Judicial discretion, Appeal, Fair trial.

Upon review of all the evidence at a rape trial in which the defendant's claim of alibi was supported by strong documentary proof, this court was of the opinion that the interests of justice required a new trial. [2-11]

INDICTMENTS found and returned in the Superior Court on June 20, 1977.

The cases were tried before *Donahue,* J., and a motion for a new trial was heard by him.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Willie J. Davis* for the defendant.

*Michael J. Traft,* Assistant District Attorney (*Sharon D. Meyers,* Legal Assistant to the District Attorney, with him) for the Commonwealth.

KAPLAN, J.   The defendant Michael Woods was convicted after jury trial upon amended indictments[1] charging

---

[1] See note 7, *infra,* regarding these amendments.

him with two acts of rape on a female victim.[2]  The Appeals
Court affirmed the convictions with rescript opinion.  9
Mass. App. Ct. 815 (1980).  We allowed the defendant's ap-
plication for further appellate review to resolve a question
of basic fairness turning on a claim of alibi.

We shall digest and analyze the evidence and in that light
assess the defendant's motions for directed verdicts of acquit-
tal and for a new trial.  We reach the conclusion that in all
the circumstances of the case a new trial should be ordered to
avoid the reproach that justice may have miscarried.

To begin with the account given by the victim.  At the
time of the criminal event she was twenty-two years old, a
college junior at Boston University.  Testifying at trial in
October, 1978, some three years after the event and at-
tempting to give her current recollection, she could not do
better than place the day of the rape as in the latter part of
September, 1975.  At 7 A.M. on the day, she arrived at the
subway station (MBTA) in Government Center, Boston, af-
ter a trolley ride from her apartment in Allston.  She was on
her way to a new part-time job in the vicinity.  As she was
looking at a posted map to locate the address, she was ac-
costed by a young black man who forced her down an esca-
lator and into a corner space at its base, and, under threat of
having a knife, compelled her to perform fellatio on him.
He proceeded to steer her up the escalator, then out of the
station and across the open plaza to a ramp which led to a
low wall near the City Hall structure.  There he forced in-
tercourse on her.  He picked up some money that had fallen
from her wallet.  After accompanying her part way back
across the plaza, he hurried off.  During the ten-minute
episode, the victim was too distraught or scared to cry out.
She walked to the place of work at Batterymarch Street and
told the men she met there that she had just been robbed but
had not tried to inform the police.  For the next two hours

---

[2] He received two concurrent "from and after" sentences of fifteen to
twenty years to be served at the Massachusetts Correctional Institution at
Walpole.

she was conducted on the route she would be working if she undertook the job.[3] Then she went home by trolley.

At her apartment she told her friends, whom we shall call Eve and Marion, that she had been raped. Urged by them to go to a hospital and to tell the police, she felt she was not equal to doing either. She handwrote a letter to her mother and father in Kansas. A Xerox copy of the letter was admitted in evidence.[4] It was dated September 24 (a Wednesday), the figure "24" being dominant but apparently superscribed on a "23" or a "25". The letter was postmarked September 26. The victim wrote that she had been raped "yesterday morning," but was all right; that she had made an appointment to see a doctor; and that she hadn't reported to the police: "I realize I do not remember enough nor could I see him at the time." (She testified that her statements were intended to discourage importunities from her mother.)

The victim testified further that she went to the Beth Israel Hospital a week or more, and to the police (District 1) a month or so, after the rape. (Again she was reporting current memory.) To the police she gave a short description of the rapist as follows: black, young, under six feet, medium build, short Afro hair style. Shown two or three hundred pictures of young black males, she did not make an identification.

In March, 1977, the victim's apartment in Brighton, to which she had moved, was entered and robbed by a young black man whom the victim had a chance to observe. She reported the robbery to the police at District 14, was shown a large number of pictures of young black males, and made no selection. Then she had a conversation with the detective "about something other than the burglary" (inferably, the subject was the rape a year and a half earlier). At that

---

[3] According to the testimony of John Sweeney, the employer, he had no records to fix the date. The victim did not return to the job.

[4] The victim asked her mother to return the original, which she did, but the victim lost it. The mother, however, had made a Xerox copy which was offered at trial.

point, she said, she was given a book of pictures and spotted one of these as a picture of the rapist. In June, 1977, the victim was in a court room of the Boston Municipal Court intending to testify at the probable cause hearing. She identified the present defendant, presumably the subject of the picture,[5] as the rapist. He was alone behind an enclosure in the court room at the time.

It was demonstrated from the records of the Beth Israel Hospital that the date of her appearance there was in fact October 1, 1975, and from the police records that the date of her appearance at District 1 was November 8. It was shown from the same records that on each occasion she gave the date of the rape as September 23 (a Tuesday). She testified to the same date at the probable cause hearing and before the grand jury. She also remarked at the probable cause hearing that the rape was on a Tuesday, the day after a "holiday."

To turn to other witnesses called by the Commonwealth, the detective at District 14 testified that after the conversation with the victim he handed her, not a book of pictures, but a two-page spread of ten pictures from which she promptly selected one. In the course of questioning by the prosecution, this witness mentioned that the picture bore a date in February, 1976, when evidently it was taken.

According to Eve (also speaking from current memory), the conversation in the apartment took place on a day in the latter part of September. The visit to the hospital could have occurred more than a week or about two weeks afterward (Eve's testimony); about two weeks afterward (Marion). Marion testified that the victim told her, within a week of the conversation in the apartment, that she had written or was writing her mother. As to holidays, Labor Day in 1975 fell on September 1 (a Monday); Yom Kippur, a Jewish holiday, on September 15 (a Monday). Attendance in classes at Boston University on Jewish holidays was considered optional with students, whether or not Jewish.

---

[5] The picture was not received in evidence. See note 15, infra.

(The victim was not Jewish.) Interrogating Eve, the prosecutor asked whether the conversation with the victim when she first described the rape might not have taken place a few days after Yom Kippur and she answered (dubiously), "Yes."

The defense called one witness, a keeper of the records at the Suffolk County House of Correction at Deer Island, where the defendant was admitted on December 19, 1974, and discharged on October 9, 1975, by decision of the parole board. The furlough records showed that the defendant left and returned to the institution during the month of September as follows:

| *Left* | *Returned* |
| --- | --- |
| September 2, 10:10 A.M. | Same day, 8:40 P.M. |
| September 5, 10 A.M. | September 6, 8:55 P.M. |
| September 13, 9:55 A.M. | September 14, 9:35 A.M. |
| September 18, noon | September 19, 10:30 A.M. |
| September 26, 3:30 P.M. | September 27, 3:30 P.M. |
| September 30, 11:45 A.M. | October 1, 5:30 P.M. |

According to the records, these were the defendant's only absences from Deer Island during the period covered, as there was no record that he had escaped, been discharged, or placed on parole or on work release. It appeared from the application for the September 30 furlough that the defendant stated his intended mode of transportation — presumably from the institution into the city — was the MBTA. (It may be noted that the September 30 furlough, like that of September 26, was beyond any possible critical date, since the victim's letter to her parents was postmarked September 26.)

When all the evidence was in, it could be said with high probability on the record made that the defendant was not present in the subway station to commit the rape if it occurred on September 23, or, indeed, on September 22 or 24 (giving effect to the semi-obliterated "23" or "25" in the

dateline of the letter). If the rape was placed on the day af-
ter the only legal holiday, Labor Day, that is, if it occurred
on September 2 — this despite the repeated assertions that it
occurred in the latter part of September — the defendant
was excluded, as his September 2 furlough started at 10
A.M. that day. If the rape was placed on September 16, the
day following Yom Kippur, the defendant was also exclud-
ed, for he was not on furlough until September 18.

Thus the prosecution was forced to the expedient of sug-
gesting that the rape happened on the morning of Septem-
ber 19 when the defendant was at large (he returned to the
institution that day at 10:30 A.M.). But September 19
would not be the day after the Yom Kippur holiday or any
other holiday (and, falling on a Friday, would not be a
plausible day for starting a job).[6] The prosecution could
suggest that date only by dint of trying to capitalize on the
very uncertainties in witnesses' recollections at the time of
trial,[7] which allowed as much as two weeks before the hos-
pital admission of October 1 as the date of the rape, and also
allowed the witness Eve to answer yes to the tendentious
question whether the conversation with the victim at the
apartment could have occurred a few days after Yom Kip-
pur. But this patchwork was opposed by the victim's letter
and her recorded statements at the hospital and at District 1

---

[6] It is fair to indicate, however, that the employer Sweeney indicated
that the start of a job need not necessarily have been at the beginning of a
week.

[7] This gives rise to a disquieting observation.

The indictments originally returned alleged that the crimes were com-
mitted "on the twenty-third day of September." After prosecution's de-
mand for disclosure of alibi, amendments of the indictments were allowed
at the start of the first trial herein to read "on or about . . . ." The de-
fendant objected to the amendments. The first trial ended in a mistrial
on the prosecutor's opening statement.

The victim, as already noted, shifted from the date September 23 to the
indefinite "latter part of September" in her testimony at trial. A like form
of words appeared in the testimony of Eve (and of Sweeney also, see notes
3 and 6, supra). These circumstances leave an impression that the
witnesses might have been accommodating, whether consciously or un-
consciously, to the alibi.

pointing to the date September 23, not to speak of Marion's testimony about the victim's report of writing to her mother.

The record-supported alibi clashed with the victim's identification. Although the victim was prompt in her identification, it was weakened by her initial bland and relatively uninforming description of the assailant; the lapse of time from the occurrence to her selection of a picture, itself drawn from a small tendered array; and the virtual one-on-one quality of the confrontation in the court room. There was no lineup or other testing comparison.

The judge denied directed verdicts at the close of all the evidence, resting the denial on the testimony of the victim. On this appeal, the defendant has preferred not to press his exception to the ruling. However, "to sustain the denial of a directed verdict, it is not enough for the appellate court to find that there was some record evidence, however slight, to support each essential element of the offense; it must find that there was enough evidence that could have satisfied a rational trier of fact of each such element beyond a reasonable doubt" (*Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 [1979]) — including here the proposition that it was this defendant who was the assailant. In this aspect the denial of the directed verdict motions could not be accounted an easy decision. See Schaefer, J., in *People* v. *Gardner*, 35 Ill. 2d 564 (1966), where firm evidence of alibi in a rape case was held to overcome identification and call for a judgment of acquittal. See also *People* v. *McGee*, 21 Ill. 2d 440, 445 (1961) ("Taken in conjunction with the uncontradicted evidence of an alibi, which is neither improbable nor such as taxes credulity, we are of the opinion there was not such positive identification here which fairly or reasonably supports the conviction").

On the motion for a new trial, made after the jury had brought in their verdicts, the judge had his opportunity to consider whether the verdicts were against the weight of the evidence, that is, so far against the general current of the evidence that to allow the verdicts to stand without retrial would involve a serious risk of perpetrating an injustice —

here the risk of a false conviction based on what the defendant contends is a classic case of mistaken identity.[8]

A trial judge's response to a new trial motion based on weight is understood to be discretionary. This entails the possibility that there may be such an abuse of discretion in a denial that an appeallate court should correct the mistake on appeal. See *Bartley* v. *Phillips*, 317 Mass. 35, 41 (1944). Yet, granted that the possibility exists, "it has repeatedly been stated that occasions when this court can do so" — set aside the action of the trial judge in refusing a new trial — "are exceedingly rare." *Hartmann* v. *Boston Herald-Traveler Corp.*, 323 Mass. 56, 61 (1948). We were speaking of civil cases, but the same applies in the criminal field, although, in the light of the relative consequences, an appellate court might be a shade more liberal in finding abuse of discretion there.

Such has been the general approach of this court.[9] The submission here, upon the defendant's exception to the denial of the new trial motion, is that the present case is a rare one. This is not the situation of a motion for a new trial based on weight where much of the evidence is subject to discount for witness credibility on either side, and the opinion of the judge who has heard the testimony is highly

---

[8] In fact, on the motion for the new trial the trial judge expressed himself at length, and negatively, about a claim that the defendant was surprised by the amendment of the indictments, but he commented only briefly and rather perfunctorily about the question of "weight."

[9] We note that less restrictive approaches have been taken elsewhere. A recent example from New York is *People* v. *Kidd*, 76 App. Div. 2d 665, 666 (N.Y. 1980). This was a "one witness identification case," where the court said "[t]he evidence of guilt was . . . legally sufficient," and "we cannot say that the verdict [was] against the weight of the evidence," but the court felt there were "seriously troublesome aspects of the case" and was "left with a disturbing feeling of a grave risk that an innocent man has been convicted." Referring to N.Y. Crim. Proc. Law § 470.15(3)(c) (McKinney 1971), which grants authority to reverse or modify a conviction "[a]s a matter of discretion in the interest of justice," the court reversed, even though this led the court to the result, not of a new trial, but of final dismissal of the case, by analogy to N.Y. Crim. Proc. Law § 470.20(5) (McKinney 1971).

significant. Here crucial phases of the evidence are documentary and not materially contingent on assessments of credibility — thus the records at Deer Island should be taken virtually to exclude as a practical matter the defendant's presence outside the institution at given times.[10] The cases naturally recognize that the existence of such firm proof ought to affect the attitude of an appellate court toward the trial judge's action in ruling on a new trial motion. See, e.g., *People* v. *Meals*, 48 Cal. App. 3d 215, 222 (1975); *Wildman* v. *State*, 69 Wis. 2d 610, 613 (1975); *People* v. *McGee*, loc. cit. *supra*. For analogy in our own reports, see *Freeman* v. *Wood*, 379 Mass. 777, 781 n.9 (1980). Referring to motions for new trial for excessive or inadequate damages, we said that "in deciding whether a jury award is excessive or inadequate the trial judge has his traditional discretion, and his view that the jury verdict should stand would generally be respected by an appellate court *at least where damages were unliquidated*" (citing cases; emphasis added). Appellate scrutiny should intensify as the damages appear liquidated;[11] and so should appellate attention in the present case, in the degree that unshaken documentary proof exists. Otherwise stated, to the extent of such proof an appellate court is in as good a position as the trial judge to decide the question of "weight."[12]

---

[10] The prosecution's questioning of the record keeper at Deer Island failed to impeach the records introduced in evidence, and the hospital and police records were also unimpeached.

[11] The damages did not approach the liquidated, nor was there compelling documentary proof in *Loschi* v. *Massachusetts Port Auth.*, 361 Mass. 714 (1972), where in an eminent domain case a divided court (four to three) refused to disturb a jury verdict in an amount exceeding the varying estimates of the expert witnesses, there being other evidence before the jury on which they could rely and base their finding.

[12] Thus our case is brought near *Commonwealth* v. *Richardson*, 1 Mass. App.Ct. 348 (1973), where the motion for a new trial was ruled on below by a judge who had not tried the case, the appellate court found itself in the same position as the motion judge, and reversed that judge's denial of a new trial.

Examining the whole case, we find further singular circumstances that strengthen our decision to allow a new trial.[13]

In the effort to suggest September 19 as the time of the assault, the prosecution in its closing argument tried to create an image in the jury's mind of the defendant in the MBTA station on the morning of that day. To this end the jury were invited to "put it all together" and connect the fact that the defendant did not return to Deer Island until 10:30 that morning, with the fact that in his application for the September 30 furlough the defendant indicated an intention to use MBTA transportation (the prosecution implied that this referred to the return to Deer Island rather than the departure). The defense protested this argument as unfair. The judge attempted a corrective charge.[14] Its efficacy in dispelling the thought, once generated, must remain dubious.

When the victim had the conversation at District 14, the detective produced, according to his testimony, a set of pictures separate from those the victim had been studying in connection with the search for the robber. It was let fall to the jury that the picture selected by the victim was taken in 1976. The defense protested that the jury would infer that the defendant was arrested for a rape postdating the event for which he was being tried. The prosecution chose to refer to the 1976 date in its closing argument. We think there

---

[13] In each of the situations of possible overreacting by the prosecution, mentioned below in our text, the defense made known its objection but there was no follow-up by specific exception or assignment of error, as was then formally required for appellate review (the formality was abandoned as from July 1, 1979, see Mass. R. Crim. P. 22, 378 Mass. 892 [effective July 1, 1979], and Mass. R. A. P. 1B [3], inserted by 378 Mass. 926 [1979]). We believe these happenings at trial may be considered as factors where the new trial issue is addressed to inherent fairness. Moreover, claimed prosecutorial transgressions have been examined here although not excepted to. See Commonwealth v. O'Brien, 377 Mass. 772, 778-779 (1979), and Commonwealth v. Freeman, 352 Mass. 556, 564 (1967).

[14] The corrective instruction was muddied somewhat by an initial remark that the defendant's statement of intention would not prove that he was at the MBTA station on September 23, leaving the possibility that it might prove his presence on some other date.

was potential prejudice. The judge had been concerned about the handling of the picture,[15] but the casual introduction of the 1976 date was untoward and probably damaging.

In its closing argument the prosecution stated that the jury were entitled to make inferences from their own observation of the defendant during the trial; then the prosecution asked (rhetorically) whether his appearance was such that a person with the victim's opportunity was likely to remember him. The defense objected to the remark and we think it was of doubtful propriety, especially in view of the brevity and generality of the description of the rapist the victim gave to the police. Although the record is not clear, the judge may have justified the remark and taken no corrective action on the ground that the prosecution was entitled to ask the jury to verify that the defendant was in fact a young black male.

The missteps mentioned can of course be avoided on retrial.[16]

On the whole, we believe justice calls for vacation of the convictions, the case to stand for trial.

*Judgments reversed.*

*Verdicts set aside.*

---

[15] The judge did not admit the picture, evidently for fear of the effect of a "mug" picture on the triers even as it might be "sanitized."

[16] On retrial the prosecution would also do well to avoid anticipating the judge's instructions with remarks about reasonable doubt using the discredited analogy to transactions like buying a house.