COMMONWEALTH *vs.* PETER C. VAUGHN.

Suffolk.   September 15, 1986. — October 20, 1986.

Present: PERRETTA, KAPLAN, & FINE, JJ.

*Robbery. Practice, Criminal,* Required finding. *Identification.*

Upon review of all the evidence presented at an armed robbery trial, this court was of opinion that the interests of justice required reversal and the entry of judgments acquitting the defendant, where photographs taken by security cameras during the robbery in question and a subsequent robbery, as well as numerous similarities between the two robberies, strongly suggested that both had been committed by the same man; where the defendant, on trial for the first robbery, had been incarcerated at the Charles Street jail at the time of the second; and where eyewitness identification testimony, the only evidence of the defendant's involvement, was not conclusive. [43-45]

INDICTMENTS found and returned in the Superior Court Department on September 23, 1983.

The cases were tried before *James D. McDaniel, Jr.,* J.

*Carlo Obligato,* Committee for Public Counsel Services, for the defendant.

*David B. Mark,* Assistant District Attorney, for the Commonwealth.

FINE, J. A Superior Court jury found the defendant guilty on three indictments[1] charging armed robbery. He urges on appeal that we examine the evidence, in particular a series of photographs and records from the Charles Street jail. He claims, on the basis of this evidence, that a rational trier of fact could not have been satisfied beyond a reasonable doubt that he was the robber. See *Commonwealth* v. *Latimore,* 378 Mass. 671, 677-678 (1979). The defendant relies principally on *Commonwealth* v. *Woods,* 382 Mass. 1 (1980). In that case, a record-

---

[1] All three indictments arise out of the same incident.

supported alibi clashed with the victim's identification of the defendant as the perpetrator, leaving the court with the definite feeling that the case was one of mistaken identity. "[T]o avoid the reproach that justice may have miscarried," the Supreme Judicial Court reversed the conviction. *Id.* at 2, 11. We find this to be one of those rare situations governed by *Woods*. The documentary evidence, not contingent on issues of credibility, was so compelling that reasonable jurors could not have been satisfied of the defendant's guilt beyond a reasonable doubt.

We summarize the evidence. On Thursday, January 6, 1983, at about 2:15 P.M., two men held up the Boylston Street Star Market in Boston. On Thursdays, employees of Sears Roebuck, Inc., located nearby, regularly cashed paychecks at the market. Consequently, large amounts of cash were on hand. Over $38,000 was taken in the robbery. One of the two robbers, the one referred to in the evidence as the "outside man," approached a security guard, one George Lodge, while he was at the liquor store adjoining the Star Market. The robber took Lodge's gun. He then approached one Mary Mueller, a liquor store cashier, and, at gunpoint, demanded money from her register. Taking Mueller and Lodge with him he then went to the courtesy booth in the supermarket and stood guard while his accomplice took money from a safe. The entire incident lasted two to five minutes.

The security guard described the culprit who held him at gunpoint as approximately five feet seven inches tall, wearing a light-colored jacket and head covering. Mueller described him as five feet seven inches tall, with a medium build and short black hair, wearing a grey and black tweed cap, jeans, and a shirt. Finally, one Lynn Bissonnette, a cashier at the courtesy booth during the robbery, described the "outside man" as five feet, seven inches tall, 160 pounds, wearing a light jacket, jeans, a tweed cap with a brim, and army-style boots.

A week or so after the robbery, Mueller selected the defendant's photograph from an array of fifteen photographs and identified him as the man who had held her up. At about the same time Lodge selected a photograph of the defendant from an array of about fifteen photographs, but he stated he "wasn't

sure." At a pretrial hearing sometime later, Lodge failed to select the defendant's photograph from the same array. Approximately six months after the robbery, Lodge, Mueller, and Bissonnette appeared at the Roxbury Municipal Court to view a suspect. The defendant, a black male, was in the dock with fifteen or twenty other males, most of whom were black. The evidence is conflicting as to whether the three were together in the courtroom when they identified the defendant or whether they had been brought in separately. At trial, Lodge and Bissonnette identified the defendant as the "outside man" in the robbery. Other than the eyewitness identification testimony, there was no evidence linking the defendant to the crime.

The principal defense evidence was a series of photographs taken by Star Market security cameras. Two of the photographs were taken on the date of the January robbery in which the defendant allegedly took part. In at least one of the two January photographs there is a good view of the clothing and general appearance of the "outside man," alleged to be the defendant. Three other photographs were taken during a robbery of the same market which occurred two months later, also at midday on a Thursday, also involving the use of a gun, and also resulting in the loss of a large amount of cash. In both robberies the outside man yelled "time"! Although facial features in the photographs are not very clear, the three photographs of the second robbery show a culprit fitting the same general description as the one in the first robbery as far as skin color, size, age, facial expression, and hair color are concerned, and wearing the same or essentially the same type of hat, jacket, trousers, and shoes. It is undisputed that on the date of the second robbery the defendant was in Charles Street jail. He could not have been in the Star Market on Boylston Street committing a robbery. The defendant also presented alibi evidence.[2]

[2] Through the woman with whom he had been living for many years, the defendant introduced evidence that at the time of the January robbery he was in Dorchester picking her up at. work. The woman stated that she remembered the day because it was her sister's birthday. A birth certificate confirming the sister's date of birth was introduced. The manager of the store where the woman was employed testified that on the day in question she worked until 2:30 P.M.

The man photographed in the second robbery appears to us to be the same person as the one in the first robbery. Although we could be absolutely certain only if we could see the facial features clearly, the accumulation of coincidences between the two incidents is remarkable. We are convinced that a reasonable jury would have had a reasonable doubt whether the defendant committed the earlier robbery. Under the *Latimore* test, therefore, he was entitled to a required finding of not guilty. The only rational explanation for the coincidences is that the same person was involved in both robberies. Since the defendant was incarcerated during the second robbery, he could not have committed it. It follows that there must be at least a reasonable doubt as to whether he committed the robbery of which he was convicted.

Normally we would look to the jury to weigh the identification testimony against the evidence offered to support a defense. To avoid the conviction of a possibly innocent person, however, it is necessary that there be an exception to that general rule. The exception would include cases which involve evidence indicative of innocence in the form of documents, photographs, or other physically-verifiable items, which an appellate court is in a position equal to that of the jury to consider.[3] See *Commonwealth* v. *Woods*, 382 Mass. at 8-9 &

---

[3] Our review of the entire record convinces us that extraneous factors, none of them by themselves justifying reversal, may have influenced the jury to reach the conclusion they did. The defendant paced the floor during the trial and apparently acted in other ways to create a poor impression in the presence of the jurors. Moreover, the prosecutor's closing argument bordered on the improper. Among other things, he described the defendant's principal record-supported defense as a "scheme . . . [devised by imaginative counsel] to confuse" the jurors (see *Commonwealth* v. *Jones*, 9 Mass. App. Ct. 103, 119 [1980], *S.C.*, 382 Mass. 387 [1981] [convictions affirmed in part and reversed in part]), and he appealed to the jurors' sympathy and fear by asking them to put themselves in the place of the victims. See *Commonwealth* v. *Sevieri*, 21 Mass. App. Ct. 745, 753-754 (1986). Also, the trial judge used language in his jury charge on identification which was the subject of criticism in *Commonwealth* v. *Fitzpatrick*, 18 Mass. App. Ct. 106, 110 (1984). Defense counsel requested before the charge that the judge eliminate the word "next" from the portion of the standard identification instruction (*Commonwealth* v. *Rodriguez*, 378 Mass. 296, 311 [1979]) which states: "You may also consider the length of time that lapsed between

n.9. Compare *Commonwealth* v. *McGann,* 20 Mass. App. Ct. 59, 67 (1985).

This is not a case in which the eyewitness identification testimony, the only evidence of the defendant's involvement, was overwhelmingly convincing. There were inconsistencies in the somewhat vague descriptions of the robber given immediately after the crime. One witness, with impaired vision, upon one occasion expressed a lack of certainty in his identification of the defendant's photograph; on another occasion he failed to identify the defendant's photograph. The first time the witnesses saw the defendant in person was more than six months after the robbery. The testimony was conflicting as to whether the three eyewitnesses viewed the defendant separately or together at the Roxbury courthouse. We are not unmindful of the fact that eyewitness testimony, however sincere, is occasionally wrong. "The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." *United States* v. *Wade,* 388 U.S. 218, 228 (1967). See *Commonwealth* v. *Francis,* 390 Mass. 89, 100 (1983).

The question of disposition remains. In *Woods,* unlike the instant case, the defendant did not press the claim that it was error for the trial judge to deny his motion for a required finding of not guilty. The error pressed in *Woods* was the denial of a motion for a new trial. Accordingly, a new trial and not an acquittal was ordered. Nevertheless, the court commented that "denial of [a] directed verdict . . . could not be accounted an easy decision" (*Commonwealth* v. *Woods,* 382 Mass. at 7), and, to support the result it reached, the court relied upon cases which were reversed with no right accorded the prosecution to a new trial. See *People* v. *McGee,* 21 Ill. 2d 440, 444-445 (1961); *People* v. *Gardner,* 35 Ill. 2d 564, 572-573 (1966). In the instant case, the defendant raised the issue of the suffi-

---

the occurrence of the crime and the *next* opportunity of the witness to see the defendant, as a factor bearing on the reliability of the identification" (emphasis supplied). Nevertheless, the word "next" was used by the judge in his charge. Finally, the jurors knew that the defendant was incarcerated in connection with other criminal charges.

ciency of the evidence in light of his record-supported defense by timely motions for required findings of not guilty at the close of the Commonwealth's case and at the close of all the evidence.[4]

For these reasons, we do not feel constrained by *Woods* to allow the Commonwealth the option of a new trial. The Commonwealth had a full opportunity to produce all the evidence it had to rebut the documentary defense at trial. Consequently, we reverse the judgments, set aside the verdicts, and order entry of judgments of acquittal.

*So ordered.*

---

[4] He also moved unsuccessfully for a new trial, but he does not argue on appeal that it was error for the judge to deny that motion. With respect to his motions for required findings of not guilty, because the Commonwealth's position as to proof had deteriorated between the time the Commonwealth rested and the close of all the evidence, the defendant had the right to an appraisal of all the evidence. See *Commonwealth* v. *Kelley,* 370 Mass. 147, 150 n.1 (1976); *Commonwealth* v. *Amazeen,* 375 Mass. 73, 80 n.5 (1978).