COMMONWEALTH vs. MICHAEL SIMS.

No. 89-P-1191.

Worcester. September 18, 1990. - January 24, 1991.

Present: DREBEN, FINE, & IRELAND, JJ

*Rape. Evidence*, Scientific test, Expert opinion, Exculpatory. *Identification.*

A defendant charged with rape and other crimes was not entitled to required findings of not guilty on the indictments on the ground that testimony of the Commonwealth's experts as to blood-typing excluded him as the perpetrator, where the experts were not in accord that the tests could exclude the defendant, neither expert testified to the degree of certainty of the tests, and the identification evidence was strong. [29-30]

INDICTMENTS found and returned in the Superior Court Department on May 11, 1988.

The cases were tried before *Herbert F. Travers, Jr.*, J.

*Eric Brandt*, Committee for Public Counsel Services, for the defendant.

*Claudia R. Sullivan*, Assistant District Attorney, for the Commonwealth.

DREBEN, J. The issue on appeal is whether the testimony of Commonwealth's experts as to blood-typing constituted such firm proof of the defendant's innocence as to entitle him to a required finding of not guilty[1] of rape and other offenses.[2] We affirm the convictions.

---

[1]Although the defendant filed a motion for a required finding of not guilty, he did so on other grounds. Because Mass.R.Crim.P. 25(a), 378 Mass. 896 (1979), provides that a judge, if the evidence is insufficient, shall enter such a finding on his own motion, and because "findings based on legally insufficient evidence are inherently serious enough to create a substantial risk of a miscarriage of justice," *Commonwealth* v. *McGovern*, 397 Mass. 863, 867-868 (1986); see *Commonwealth* v. *Assad*, 19 Mass. App. Ct. 1007, 1008 (1985), we do not treat the issue as waived.

[2]See *Commonwealth* v. *Woods*, 382 Mass. 1, 2 (1980), which reversed a conviction and ordered a new trial because the defendant was incarcerated

The evidence would have warranted the jury in finding these facts. At approximately 4:00 on the morning of March 5, 1988, a man entered the Honey Farms convenience store on Highland Street in Worcester, grabbed the night clerk who was alone in the store, dragged her to the back and raped her orally, vaginally, rectally and again vaginally. He then made her open the cash register from which he took money in the following denominations: one ten, two or three fives, sixteen to eighteen singles, and some quarters.

Upon the man's departure, the victim called the police and described her assailant as a black male, age eighteen to twenty-five, wearing black jeans, a white T-shirt, and a distinctive gray and white jacket with a zig-zag pattern and epaulets on the shoulder. The description was broadcast, and an employee of a Store 24 convenience store, who had been listening to a police scanner, became aware that a man, driven to the Store 24 in a taxi, fit the description. After the man had left the store in the cab in which he had come, the employee called the police. Worcester policemen stopped the taxi, and one of the officers drove the suspect to the Honey Farms store. The victim recognized him as the man who had raped her and also recognized his distinctive jacket. Earlier, police officers had driven the victim to look at another man who, she said, was not her assailant. At trial she identified the defendant as the intruder.

The defendant was arrested and taken to a police station where money in the following denominations was taken from him: one ten, two fives, seven singles, and fourteen quarters. At the station, the defendant cried and asked what he could "get for this."

Three scientific experts were presented by the Commonwealth. The first, Robert Pino, a chemist with the Department of Public Safety, testified that he found seminal fluid

at the time of the incident, and *Commonwealth* v. *Vaughn*, 23 Mass. App. Ct. 40 (1986), which reversed a conviction where photographs indicated that the same person committed two different robberies, and the defendant was in jail at the time of one of them.

and sperm on the victim's blue jeans (only a few spermheads), on a panty shield in her underwear, on a vaginal swab from the victim, and on the defendant's underwear. He also found blood on the jeans. Prior to his testing,[3] the samples were kept in the evidence room at room temperature; after his testing, the samples which had tested positive for sperm were kept in frozen storage and were then given to another department chemist, Karolyn LeClaire.

The second expert for the Commonwealth was Dr. Bing, an expert hired by the defendant.[4] The Commonwealth had agreed that testing by an independent expert was needed; if additional tests were conducted by the Commonwealth, insufficient sample material would remain for an expert for the defendant. (The material is consumed during the testing process.) Dr. Bing had first been given stain samples (six in all) from the victim's jeans, panty shield, and vaginal swab and also from the defendant's underwear. He performed a blood test for "ABO, for Lewis, and . . . performed a test for a protein called PGM, which is called phosphoglucomutase."[5] He tested all six stains and detected blood group substance A

[3]The record does not show when the tests were conducted, but only indicates that the chemist received the evidence on March 7, 1988, and wrote his report on August 4, 1988.

[4]Two of the scientific experts presented by the Commonwealth were not helpful to its case. Because of reciprocal discovery orders, the prosecution was faced with the Hobson's choice of calling the scientists as its witnesses or having the defendant do so.

[5]He explained: "ABO is one of the blood systems that is found in all humans. An individual can be Type A, Type B or Type O. The Lewis blood system is yet another blood[ ] testing system. One is Lewis A positive, or A negative, or B positive or B negative. The third test is a test for a protein that is found in biological fluids in humans. This is a protein which is an enzyme that is detected by its ability to convert small molecules into another form, which can then be detected by a color which is generated." See also *Commonwealth* v. *Willie*, 400 Mass. 427, 429 nn. 3 & 4 (1987).

The "ABO" test determines a person's blood group by the antigens present on the red cells. Karolyn LeClaire, one of the Commonwealth's experts, testified that a person who is type O shows a presence of H blood group substance (antigen). See 2 Wecht, Forensic Sciences § 29.05[c] at 29-46 (1988). The Lewis system reveals whether the donor is a secretor, that is, a person whose blood type can be determined from other body fluids such as semen or vaginal fluid.

in the jean stain and in the vaginal swab and detected the PGM subtype 1+ 2+ in the jeans stain. Nothing was found as to blood groupings or subtypings in the other stains, although the panty shield had a substantial stain. Subsequently, Dr. Bing was given two tubes of blood collected from the defendant and the victim. The results of the blood typing were: the defendant was group O, Lewis A-B+, PGM subtype 1+; the victim was group A, Lewis A-B+, PGM subtype 1+ 2+. When asked the significance of his findings, Dr. Bing stated that the stains "were inconsistent with being derived from the same person who contributed the sample labeled Sims, Michael."

In order to counter this conclusion, the prosecutor elicited from Dr. Bing that the test results were not uniform. Unlike the chemist from the Department of Public Safety, Dr. Bing could detect no sperm on the jean stain. He was asked a hypothetical question, namely, to assume that seminal fluid residue with sperm cells was found in March, and that, when similar tests were performed in November, seminal fluid residue with sperm cells was not detected. He was asked to explain. Dr. Bing's opinion was that he "would assume that the material had degraded."[6] On cross-examination, Dr. Bing reiterated that he had found nothing on the jean stain or elsewhere to indicate that Michael Sims was the donor of the blood type he found. On redirect, he testified that he found nothing that would allow him to conclude that Sims was the donor or not the donor.[7]

---

[6]Dr. Bing explained: "Biological fluids such as blood and seminal fluid contain materials in them which lead to degradation of those materials. It is a normal part of the body function that this happens. Those processes can be arrested by careful storage of the material. But if the material is not particularly well preserved, this degradation is a normal process that will occur."

[7]Although the defendant would have us believe that Dr. Bing's unwillingness to exclude the defendant was on the ground that he was not sure that the blood sample came from the defendant even though it had his name on it, this conclusion, suggested by Dr. Bing's voir dire statements, was not supported by his trial testimony. A number of reasons why tests may not be determinative were given by Karolyn LeClaire.

The third Commonwealth expert was Karolyn LeClaire, another chemist of the Department of Public Safety. Her testimony was most helpful to the defendant. She performed the same tests as Dr. Bing, and she determined by the Lewis test that both the victim and the defendant were secretors; that the defendant had group O type blood; the victim A; the defendant's PGM subtype was $1+$; the victim's: $1+2+$. She performed an absorbtion-inhibition test on the stains for the presence of A, B and the O blood group system secretor substance and found no O except on the defendant's underwear.[8] She detected evidence of seminal fluid on the jeans. Although she found a PGM result consistent with the defendant's subtype on the stain on the jeans, on cross-examination, presumably because of the other test results, she stated that he was excluded as a donor of the seminal fluid in the stain on the jeans and the vaginal swab.

On redirect, LeClaire testified that sometimes blood group factors belonging to secretors do not show up. Stains deteriorate. Moreover, some persons are aberrant secretors, that is, they sometimes secrete blood substances and sometimes do not. She also testified that the female body recognizes seminal fluid as a foreign substance and "sets about in essence to destroy or to get rid of [it] and flush it from the body." Her failure to find an H (i.e., O) blood group substance on the vaginal swab could be consistent with the flushing function.

On the foregoing evidence, this case does not fall within the ambit of *Commonwealth* v. *Woods*, 382 Mass. 1, 9 (1980), or *Commonwealth* v. *Vaughn*, 23 Mass App. Ct. 40, 41 (1986), the cases relied upon by the defendant. The exculpatory evidence is not "so compelling that reasonable jurors could not have been satisfied of the defendant's guilt beyond a reasonable doubt," *Commonwealth* v. *Vaughn*, 23 Mass.

---

[8]Although, as previously noted, a heavy seminal stain was present on the panty shield, all blood type testing on it was inconclusive. On the vaginal swab, A blood group substance was present; the testing of the PGM subtyping was inconclusive. The men's underwear showed presence of H blood group substance (i.e., O), but the PGM subtype system was inconclusive.

App. Ct. at 41, and does not require a new trial. *Commonwealth* v. *Woods*, 382 Mass. at 9.

Unlike the exclusion of paternity where the results are considered conclusive,[9] see *Commonwealth* v. *D'Avella*, 339 Mass. 642, 645-646 (1959); *Symonds* v. *Symonds*, 385 Mass. 540, 546 (1982), Dr. Bing and LeClaire were not in accord that the tests could exclude the defendant. Moreover, neither testified to the degree of certainty of the tests.

We have been cited to no case where conclusiveness has been accorded to blood tests in sexual assault cases.[10] To the contrary, the normal rule as to expert testimony, see Liacos, Massachusetts Evidence 104 (5th ed. 1981 & Supp. 1985), and cases cited, is applied in these cases; the evidence is for the jury to weigh. See *Commonwealth* v. *Chapman*, 255 Pa. Super. 265, 277 (1978). Cf. *State* v. *Hagen*, 391 N.W.2d 888, 890-891, 893 (Minn. Ct. App. 1986); *State* v. *Acklin*, 317 N.C. 677, 681-683 (1986). See also *Commonwealth* v. *Gomes*, 403 Mass. 258, 273 (1988).

Given the strength of the identification evidence and the exhibits, particularly the distinctive jacket which we have examined, we hold that there was no error in the denial of the defendant's motion for a required finding of not guilty.

*Judgments affirmed.*

---

[9]Indeed, one source states: "Serological exclusions in paternity investigations are absolute, and show that the putative father cannot be the parent of the child in question, given the particular mother." 2 Wecht, Forensic Sciences § 30.03[b], at 30-33 (1988). See also *Commonwealth* v. *Blazo*, 10 Mass. App. Ct. 324, 326 (1980), as to the reliability of these tests. See also note 10, *infra*.

[10]In paternity cases, blood samples are obtained under controlled laboratory conditions. Also, whole or clotted blood is much easier to group than dried blood. 2 Wecht, Forensic Sciences § 29.07[a], at 29-86 (1985).