## COMMONWEALTH *vs.* RONALD QUALLS.

Suffolk. November 7, 2003. - December 15, 2003.

Present: GREANEY, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Evidence,* Identity, Relevancy and materiality, Hearsay, State of mind, Motive,
Photograph, Corroborative evidence. *Homicide. Practice, Criminal,* Mis-
trial, Instructions to jury, Argument by prosecutor, Assistance of counsel,
Capital case. *Constitutional Law,* Assistance of counsel.

At the trial of two indictments charging murder in the first degree and indict-
ments for assault and battery by means of a dangerous weapon and unlaw-
ful possession of a firearm, a Superior Court judge properly denied the
defendant's motion for required findings of not guilty, where the Com-
monwealth's evidence was sufficient to prove identity. [581-583]

A Superior Court judge properly denied a criminal defendant's motion for a
mistrial based on a witness's testimonial references to the defendant's first
trial on the same charges, where the witness did not specify that the first
trial was on the same charges, where his first reference to the "trial last
time" was struck, where the jury were instructed to disregard the testimony,
and where the judge essentially advised the jury not to engage in conjecture
about what may have occurred between the date of the charged conduct
and the date of the current trial. [583-584]

The defendant at the trial of two indictments charging murder in the first
degree was not prejudiced by testimony of his probation officer, where that
testimony did not suggest that the defendant had involvement with the
criminal justice system prior to the instant case. [584-585]

Testimony at the trial of two indictments charging murder in the first degree
regarding the victim's announcement to the defendant that he had stabbed
the defendant's cousin was not prohibited hearsay where it was not admit-
ted for its truth, but to show the defendant's state of mind and possible
motive, and the absence of a limiting instruction did not create a substantial
likelihood of a miscarriage of justice. [585]

The admission in evidence of two autopsy photographs at the trial of two
indictments charging murder in the first degree did not constitute an abuse
of discretion, where neither photograph was particularly inflammatory, and
where both photographs aided the jury in evaluating the medical examiner's
testimony concerning the trajectory of the bullets that inflicted the various
wounds, corroborated certain testimony concerning where the shooter
stood in relation to the victims, and were relevant to proving premeditation.
[585-586]

No substantial likelihood of a miscarriage of justice arose at a trial of two
indictments for murder in the first degree where the prosecutor, during her
opening argument, promised to prove that one of the victims had killed the

defendant's cousin, absent a showing of bad faith or prejudice; likewise, the prosecutor's closing argument, which ascribed to the defendant a motive of revenge, was not erroneous, where the challenged remarks found support in the testimony, and where the defendant's belief about the victim's conduct, not whether such conduct occurred, was relevant. [586-587]

There was no merit to a criminal defendant's claim of ineffective assistance of trial counsel claim based on his trial counsel's failure to move for relief from prejudicial joinder of the charge of assault and battery by means of a dangerous weapon with two charges of murder in the first degree, where the defendant had not satisfied his burden of showing the requisite degree of prejudice. [587]

INDICTMENTS found and returned in the Superior Court Department on November 10, 1992.

Following review by this court, 425 Mass. 163 (1997), the cases were tried before *Patrick F. Brady*, J.

*Greg T. Schubert* for the defendant.

*Rami M. Vanegas*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. Based on a shooting that occurred in the early morning of October 3, 1992, in a parking lot in the Roxbury section of Boston, a jury found the defendant guilty on two indictments charging murder in the first degree, and on indictments charging assault and battery by means of a dangerous weapon, assault by means of a dangerous weapon, and unlawful possession of a firearm.[1] The defendant had been retried after we reversed his initial convictions on the ground that improperly admitted hearsay evidence had caused prejudice. See *Commonwealth* v. *Qualls*, 425 Mass. 163, 169-170 (1997). Represented by new counsel, the defendant argues that the evidence was insufficient to convict him and that the judge erred in denying his motion for a mistrial based on a witness's reference to the first trial and in failing to give an adequate curative instruction; in admitting testimony of the defendant's probation officer; in admitting hearsay evidence; and in admitting in evidence autopsy photographs of one of the victims. The defendant also

---

[1]The conviction of assault by means of a dangerous weapon was placed on file with the defendant's consent and, therefore, is not before us. See *Commonwealth* v. *Delgado*, 367 Mass. 432, 438 (1975).

argues that a substantial likelihood of a miscarriage of justice exists because of improper statements made by the prosecutor in her opening statement and closing argument and that his trial counsel furnished ineffective assistance. Finally, the defendant argues that we should exercise our power under G. L. c. 278, § 33E, to reduce the verdict to a lesser degree of guilt or to order a new trial. We affirm the convictions and deny relief under G. L. c. 278, § 33E.

The jury could have found the following facts. On the evening of October 2, 1992, Leroyal Holmes, Fred Monroe, and the victims, Ronald Price, known as "Dallas," and his brother, Roosevelt Price, known as "Tony," got together at the Biarritz bar in the Roxbury section of Boston. There, Dallas saw the defendant[2] and told him that he had heard that the defendant had been looking for him. The defendant said that he did not know who Dallas was. Dallas replied that he was the person who had stabbed the defendant's cousin. A fist fight between the two ensued. During the fight, Tony became involved, grabbed the defendant, and placed him in a headlock. An off-duty police detective and a bouncer at the bar broke up the fight, and the detective escorted the defendant outside.

Back inside the bar, Dallas approached the defendant's companion, James Earl "Junior" Williams,[3] and asked him why he was on the defendant's side. Dallas protested that Williams was "supposed to be" his cousin. Williams said that he was "down" with the defendant because the defendant put his "life on the line" for Williams.

Moments later, outside the bar, the defendant got into a fight with Tony. During the fight, the defendant pulled out a knife and swung it at Tony. The defendant then got into the front passenger seat of Williams's automobile, a dark-colored Ford Escort, and the two drove off.

Tony, Dallas, Holmes, and Monroe went to another bar. They encountered Donna Carrington and Mattie Buford, Monroe's girl friend, in the bar's parking lot. The men told the women to park Carrington's Geo Tracker, a two-door vehicle, in the lot

<hr>

[2]The defendant was five feet, nine inches tall, and weighed 140 pounds.

[3]Williams was five feet, nine inches tall, weighed 210 pounds, and was darker skinned than the defendant.

while they went into the bar. After being denied admission because the bar was closing, the men returned to the parking lot, where Tony told the group that he did not feel well.

The group discovered that Tony had been stabbed near and beneath his right armpit. Tony and Dallas got into the back seat of Carrington's vehicle so that she could drive Tony to a nearby hospital. Tony sat in the back seat behind Carrington, and Dallas sat in the right rear passenger seat next to Tony.

As Tony and Dallas were getting into the vehicle, Dallas observed Williams's automobile drive by. Monroe saw that Williams was the driver and that the defendant was a passenger. Concerned, Holmes walked over to where Williams's automobile was headed and the defendant "popped up" in front of him. Holmes grabbed the defendant and told him to "let it go." The defendant pulled out a .38 caliber revolver and pointed it at Holmes, stating that he would blow Holmes's head off if he did not get out of the way. As the defendant approached Carrington's vehicle, Holmes shouted that the defendant was "strapped," meaning that he was armed.

Hearing Holmes's warning, Buford ran across the street. Monroe ran to the corner of the parking lot. The defendant approached the rear of Carrington's vehicle and fired multiple shots into the plastic covering in the back of the vehicle, then, from the front passenger side of the vehicle, through the open window, fired more shots into the back seat. The defendant then fled on foot, running past Buford.

Monroe ran to Carrington's vehicle and jumped in. Carrington drove to Tony's apartment. Tony went into the apartment. Dallas was slumped over in the back seat, blood running out of his mouth. Holmes, who ran behind the vehicle as it drove off, got into the passenger seat and told Monroe to get inside the vehicle and drive Dallas to a hospital. Dallas died within minutes of his arrival.

Police and emergency medical workers went to Tony's apartment. Tony approached the police and told them that Junior Williams had shot him, adding that Junior drove a black or blue Ford Escort. He also gave them Junior's address, and told them that Junior had a sister who lived on Ruggles Street. He stated

that two males had been in the Ford Escort when it drove by. Tony was transported to a hospital, where he subsequently died.

Shortly after 4 A.M., October 3, 1992, the police stopped Williams's Ford Escort. During the stop, Williams pointed at Holmes, who happened to be walking by. Earlier, Holmes had fled the hospital because he did not want anyone questioning him. The police brought both men in for questioning separately. Williams was wearing a gray sweatshirt.

At the police station, Holmes identified the defendant as the shooter from a photographic array. He stated that the defendant had been wearing a blue "Members Only" jacket. Monroe initially gave the police false identification information because he did not want to get involved. However, he later identified the defendant as the shooter from a photographic array. Monroe told police that the defendant had been wearing a dark-colored hooded sweatshirt.

Approximately one week after the shootings, Buford identified the defendant as the man she saw approach Carrington's vehicle at the time of the shooting. Buford did not actually observe the defendant shoot into, or at, Carrington's vehicle, but, after hearing the warning that the defendant was "strapped," saw the defendant run through the parking lot over to the back of the Tracker. She heard gunshots and then saw the defendant run away from the vehicle. The defendant ran right past her.

Carrington was not able to identify the defendant as the shooter. She described the shooter, however, as a black male, about eighteen or nineteen years of age; about five feet, seven inches tall; medium build; and wearing a dark blue Champion sweatshirt. She described the driver of the Ford Escort as darker skinned than the passenger, and identified Williams's Ford Escort as the automobile that drove by them prior to the shooting.

Both Dallas and Tony died of gunshot wounds to the chest. One of the shots fired at Dallas had been at close range. Of the three .38 caliber bullets recovered from their bodies, at least one from each body had been fired from the same weapon.

The gray sweatshirt that Williams had been wearing when he had been apprehended had several very small stains on the front and back which were later determined to be type B human

blood. Williams, Dallas, and Tony had type B blood. The stains did not penetrate through the sweatshirt and were consistent with someone getting a paper cut and then wiping a hand on a shirt. There had been no blood on the back window of Carrington's vehicle, which suggested that blood had not passed through the window. A leather coat, such as the one Dallas had been wearing when he was shot, could prevent blood splatter or spurting from a gunshot wound.

The defendant had type A blood. Type A blood was found on the front passenger seat of Williams's Ford Escort, and on the passenger door handle. The defendant's fingerprint was found on the outside of the passenger door window.

The jury could also have found that the defendant exhibited consciousness of guilt. In the spring of 1993, the defendant telephoned Holmes and told him to tell Monroe and Buford that they had picked the wrong person. In March, 1998, Holmes encountered the defendant in downtown Boston, after Holmes had met with the defendant's attorney at the court house. The defendant told Holmes that he knew where Holmes worked and lived, and also knew where Holmes's son's mother lived. The defendant added that the court was trying to put him away for life and that he had nothing to lose. A couple of the defendant's friends followed Holmes to the bus stop. Holmes took a taxi cab, and subsequently relocated.

The defendant did not testify. His defense was that Williams was the shooter. He called two police officers to testify. The first officer testified that Dallas had had a confrontation with Williams at the Biarritz bar, and that Monroe initially had told him that he did not know the identity of the shooter. The second officer confirmed that Tony had named Williams as the shooter.

1. *Sufficiency of the evidence.* The judge denied the defendant's motions for required findings of not guilty presented at the close of the Commonwealth's case and at the close of all the evidence. The defendant argues that the Commonwealth's proof was insufficient to sustain the convictions because the identification evidence was, as a matter of law, unreliable. He also contends that, in light of Tony's identification of Williams as the shooter, and his own assessment that the identification evidence was not credible, we should apply the exception

formulated in *Commonwealth* v. *Vaughn*, 23 Mass. App. Ct. 40, 43 (1986), in the following terms:

> "Normally we would look to the jury to weigh the identification testimony against the evidence offered to support a defense. To avoid the conviction of a possibly innocent person, however, it is necessary that there be an exception to that general rule. The exception would include cases which involve evidence indicative of innocence in the form of documents, photographs, or other physically-verifiable items, which an appellate court is in a position equal to that of the jury to consider" (footnote and citation omitted).

Under the applicable test, see *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), the Commonwealth's evidence was sufficient to prove identity, and the Commonwealth's position as to proof did not deteriorate during the defendant's case, see *Commonwealth* v. *Basch*, 386 Mass. 620, 622 & n.2 (1982). Two witnesses, Monroe and Holmes, positively identified the defendant as the shooter. Buford identified the defendant as the man who approached Carrington's vehicle, and as the man she saw flee the area after hearing gunshots. Carrington's description of the man who approached both the back and side of her vehicle, in some aspects, was consistent with a description of the defendant. Buford's and Carrington's testimony furnished further proof that the defendant was the shooter. See *Commonwealth* v. *Castro*, 438 Mass. 160, 165 (2002). The Commonwealth also introduced evidence from which the jury could have inferred that the defendant displayed consciousness of guilt, including evidence that he told Holmes to tell Monroe and Buford that they had picked the wrong person, and evidence that he threatened Holmes. See *id.* Although the defendant impeached the testimony of Holmes, Monroe, and Buford in various ways,[4] it was for the jury to evaluate their testimony and determine credibility. See *Commonwealth* v. *Clary*, 388

---

[4]The defendant's impeachment evidence showed that one or more of the witnesses had lied to police, had made inconsistent statements, had pending criminal matters that potentially swayed their testimony, had multiple prior convictions, had default or outstanding warrants, and had police or prosecutorial assistance in removing defaults or resolving pending criminal matters.

Mass. 583, 589 (1983); *Commonwealth* v. *Hoffer*, 375 Mass. 369, 377 (1978).

There is also nothing in the *Vaughn* case that aids the defendant. *Vaughn* involved two armed robberies that the facts indicated had been committed by the same person. *Commonwealth* v. *Vaughn, supra* at 41-42. Jail records, however, disclosed that the defendant was incarcerated when the second robbery occurred, thus conclusively undermining the jury's acceptance of the testimony identifying the defendant as the robber. *Id.* at 42. There is no similar documentary or tangible evidence in this case. Rather, the jury could have permissibly disregarded Tony's dying declaration[5] and accepted the identification and other evidence outlined above to convict the defendant.

2. *Denial of motion for a mistrial.* Holmes testified on direct examination that he had run into the defendant in March, 1998. Holmes had just met with the defendant's lawyer. The defendant asked Holmes about an envelope in Holmes's possession, which, Holmes testified, contained "[t]ranscripts from the trial last time." The defendant's trial counsel objected, and the judge instructed the jury to disregard Holmes's statement.

Holmes subsequently testified that he told the defendant that he had met with the defendant's lawyer and "wasn't going to testify again," and that he "didn't want to go through that again." The defendant's trial counsel did not object.

Later, during his cross-examination in which the defendant's trial counsel was trying to elicit a prior inconsistent statement, Holmes made two other references to a prior trial. At a sidebar conference, the defendant's trial counsel moved for a mistrial, which was denied. A curative instruction was not requested. The defendant argues that the judge abused his discretion in refusing to grant his motion for a mistrial based on Holmes's references

---

[5]Tony was the only person to name Williams as the shooter. Tony had been seriously wounded, the shooting occurred when it was dark, there was evidence that the defendant and Williams were the same height and that each had been wearing a hooded sweatshirt, and there was evidence that the shooter stood behind Tony, and then to his right, obstructed by Dallas. There was also no dispute at trial that, just prior to the shooting, Williams and the defendant had been together, driving in the same automobile, and together in that automobile approached the parking lot where Carrington's vehicle was parked.

to the defendant's first trial and the absence of a curative instruction.

Holmes's first reference to the "trial last time" was struck, and the jury were instructed to disregard the testimony. Jurors are presumed to follow instructions to disregard testimony. *Commonwealth* v. *Cortez*, 438 Mass. 123, 130 (2002). In the remaining references, Holmes did not indicate that the previous trial was on the same charges, nor did he suggest the outcome of that trial. Cf. *Commonwealth* v. *Arsenault*, 361 Mass. 287, 299-300 (1972) (numerous references to "prior proceeding" coupled with testimony that witness had met defendant while in prison gave rise to inference that defendant had been previously tried and convicted). The final two references to the "trial" were elicited by the defendant's trial counsel in an attempt to impeach Holmes with his testimony from the first trial. See *id.* at 300-301.

There is no requirement that, in circumstances like these, a judge must give a curative instruction sua sponte. See *Commonwealth* v. *Leonardi*, 413 Mass. 757, 764 (1992). Potential prejudice to the defendant was remedied when, in his final instructions, the judge told the jury: "You should not speculate about why so much time has elapsed since the events . . . which gave rise to this case. Neither the Commonwealth [n]or the defendant is responsible or at fault for the delay. Any speculation about the delay by you would be very improper, most likely certainly incorrect, and like any speculation, might lead to a miscarriage of justice." This instruction, in substance, advised the jury not to engage in conjecture about what may have occurred between the date of the shooting and the date of the current trial. There was no abuse of discretion in denying the defendant's motion for a mistrial.[6] See *Commonwealth* v. *Gallagher*, 408 Mass. 510, 517 (1990).

3. *Evidentiary issues.* (a) We reject the defendant's argument that he was prejudiced by testimony of his probation officer. The probation officer testified that the defendant was near the court house on March 10, 1998, at approximately 2 P.M. She

---

[6]For these same reasons, we find no substantial likelihood of a miscarriage of justice based on the defendant's trial counsel's failure to request a curative instruction. See *Commonwealth* v. *Frank*, 433 Mass. 185, 187 (2001).

indicated that the defendant had reported on that date, as a condition of his pretrial release in connection with this case, and she did not suggest in any manner that the defendant had prior involvement with the criminal justice system. The probation officer's testimony corroborated Holmes's testimony that the defendant had been in the area about the time when the defendant engaged in threatening comments and actions. The judge concluded, within his discretion, that the probative value of the testimony outweighed any prejudice.[7]

(b) At trial, Monroe testified, over objection, that, hours before being shot, Dallas told the defendant, "I am the one who stabbed your cousin." The defendant argues that this evidence was improperly admitted because there was no evidence that the person Dallas killed was, in fact, the defendant's cousin. The testimony was not prohibited hearsay because it was not admitted for its truth, but to show the defendant's state of mind and possible motive, see *Commonwealth* v. *Qualls*, 425 Mass. 163, 167 (1997). In addition to Monroe's testimony that Dallas communicated the statement to the defendant, Monroe testified that, in response to Dallas's statement, the defendant became angry and started pacing, permitting an inference that the defendant had heard Dallas's statement. A limiting instruction as to the use of the testimony was not requested, see *Commonwealth* v. *Leonardi*, *supra* at 764, and its absence does not create a substantial likelihood of a miscarriage of justice.[8]

(c) The judge did not abuse his discretion, see *Commonwealth* v. *DeSouza*, 428 Mass. 667, 670 (1999), in admitting two autopsy photographs of Tony, one depicting a probe going

---

[7]Although the probation officer should have been included in the prosecutor's witness list, in the absence of any evidence of bad faith, and in the absence of any demonstration of prejudice by the defendant from the late disclosure, there was no abuse of discretion on the part of the judge in permitting her to testify. See *Commonwealth* v. *Trapp*, 423 Mass. 356, 363-364, cert. denied, 519 U.S. 1045 (1996); *Commonwealth* v. *Donovan*, 395 Mass. 20, 24 (1985).

[8]No substantial likelihood of a miscarriage of justice exists by reason of the defendant's trial counsel's failure to request a limiting instruction as to the use of Monroe's testimony. See *Commonwealth* v. *Frank*, *supra*. We note that the defendant's trial counsel pointed out in his closing argument to the jury that the prosecutor had failed to prove that Dallas actually killed the defendant's cousin.

through two bullet wounds in Tony's arm, and the other showing, the defendant claims, "a graphic, gaping incision exposing internal organs." While more care could have been taken by the Commonwealth in not showing the incision and exposed tissue depicted in the second photograph, see *Commonwealth* v. *Bastarache*, 382 Mass. 86, 106 (1980), neither photograph was particularly inflammatory. Moreover, both photographs aided the jury in evaluating the medical examiner's testimony concerning the trajectory of the bullets that inflicted the various wounds. See *Commonwealth* v. *Haas*, 398 Mass. 806, 816 (1986); *Commonwealth* v. *Todd*, 394 Mass. 791, 796 (1985); *Commonwealth* v. *Paszko*, 391 Mass. 164, 194 (1984) (Appendix). The issue of trajectory would become relevant if the jury rejected the eyewitness testimony of Holmes and Monroe that the defendant was the shooter. Without that testimony, the jury would have to analyze the testimony of Carrington and Buford, from which they could have inferred that the defendant was the shooter. While Carrington and Buford did not see the actual shooting, they observed the defendant approach Carrington's vehicle immediately prior to hearing gunshots and observed where the victims were seated in Carrington's vehicle before they were shot. Carrington testified that she heard gunshots from the rear of her vehicle and from the passenger side. The autopsy photographs, as explained by the medical examiner, corroborated their testimony, particularly Carrington's, concerning where the shooter stood in relation to the victims. Both photographs were also relevant to proving premeditation. See *Commonwealth* v. *Jackson*, 428 Mass. 455, 464 (1998).

4. *Statements by the prosecutor.* We reject the defendant's argument that a substantial likelihood of a miscarriage of justice exists because the prosecutor, during her opening statement, promised to prove that Dallas did, in fact, kill the defendant's cousin, and because, in her closing argument, the prosecutor argued that the defendant's motive was revenge. The prosecutor could state in her opening statement anything she reasonably, and in good faith, expected to prove. *Commonwealth* v. *Errington*, 390 Mass. 875, 883 (1984). Absent a showing of bad faith or prejudice, which has not been made, the fact that certain evidence fails to materialize is not a ground for reversal. See *id.*

Contrary to the defendant's contention, the challenged remarks from the prosecutor's closing argument concerning motive find support in Monroe's testimony that Dallas had told the defendant that he (Dallas) had stabbed the defendant's cousin. Whether true or not, the defendant's belief that Dallas was responsible for that stabbing death provided a motive for the defendant's subsequent shooting of Dallas. That the prosecutor did not prove that Dallas had, in fact, stabbed and killed the defendant's cousin, as previously explained, was not required to admit Dallas's statement. The prosecutor did not argue that Dallas had actually killed the defendant's cousin. We note that the defendant's trial counsel, in his closing argument to the jury, pointed out the fact that the prosecutor had not shown that Dallas had stabbed the defendant's cousin. There was no error in the closing argument.[9]

5. *Effective assistance of trial counsel.* The defendant maintains that he was deprived of his constitutional right to effective assistance of trial counsel based on his trial counsel's failure to move for relief from prejudicial joinder of the charge of assault and battery by means of a dangerous weapon (resulting from the defendant's stabbing Tony outside the bar). The defendant argues that joinder of this offense was prejudicial because if the defendant "stabbed Tony . . . then he probably also shot Tony and Dallas." The defendant has not satisfied his burden of showing that "the prejudice resulting from a joint trial is so compelling that it prevent[ed] [him] from obtaining a fair trial." *Commonwealth* v. *Delaney*, 425 Mass. 587, 595 (1997), cert. denied, 522 U.S. 1058 (1998), quoting *Commonwealth* v. *Clarke*, 418 Mass. 207, 217 (1994). The stabbing of Tony was related in time and space to the shooting, and the stabbing was relevant to show deliberate premeditation by indicating that the defendant harbored ill will toward Tony.

6. *G. L. c. 278, § 33E.* We have reviewed the entire record under our statutory obligation, and we are not persuaded that

---

[9]Because no substantial likelihood of a miscarriage of justice arose by virtue of the challenged statements made by the prosecutor in her opening statement, and because there was no error in her closing argument, the defendant's ineffective assistance of trial counsel claim, based on his trial counsel's failure to object to those statements, also fails. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

anything requires us to reduce the jury's verdicts of murder in the first degree or to order a new trial.

*Judgments affirmed.*