## Commonwealth *vs.* Jose Rosa.

No. 07-P-1005.

Essex. February 5, 2008. - January 20, 2009.

Present: Cypher, Armstrong, & Rubin, JJ.

*Practice, Criminal,* Opening statement, Argument by prosecutor, Instructions to jury.

A criminal defendant failed to demonstrate that a statement in the prosecutor's opening at a criminal trial, in which the prosecutor incorrectly asserted that one witness would directly corroborate another witness's testimony, was either the product of bad faith or prejudicial to the defendant. [543-544]

At a criminal trial, errors in the prosecutor's closing argument, which contained improper appeals to the jury's sympathy (resulting from the prosecutor's repeated and excessive references to the victim's status as a firefighter and to the seriousness of the victim's injuries) and improper vouching, unsupported by inferences from the evidence, for the photographic array used by the police to identify the defendant, did not, singly or together, create a substantial risk of a miscarriage of justice, in light of the strength of the Commonwealth's case. [544-550]

There was no merit to a criminal defendant's claims of error regarding the judge's instruction that the jury were not to decide the case based on sympathy [550] or the judge's failure to instruct the jury, sua sponte, on the issue of consciousness of guilt [551].

Complaints received and sworn to in the Lawrence Division of the District Court Department on November 26 and December 24, 2001.

The cases were tried before *Thomas M. Brennan,* J.

*Iris Alkalay* for the defendant.

*Tara Blackman,* Assistant District Attorney, for the Commonwealth.

Rubin, J. The defendant was convicted of assault and battery on a public servant, leaving an accident scene after causing personal injury, and operating a motor vehicle so as to endanger.[1]

---

[1]The defendant's motions for required findings of not guilty on charges of

On appeal, he alleges several errors in the prosecutor's opening statement and closing argument, and in the judge's instructions to the jury. He also argues that his trial counsel was ineffective for failing to object to the alleged errors.

We conclude that there were errors in the prosecutor's closing argument. Because the defendant failed to preserve his objection to them, however, our review is limited to determining whether the errors created a "substantial risk of a miscarriage of justice." *Commonwealth* v. *Grandison*, 433 Mass. 135, 142 (2001). The same standard applies to the defendant's ineffective assistance claim. *Commonwealth* v. *Randolph*, 438 Mass. 290, 296 (2002). Because "we are persuaded that [the errors] did not materially influence[] the guilty verdict," *Commonwealth* v. *Alphas*, 430 Mass. 8, 13 (1999) (citation omitted), we affirm.

1. *Factual background.* We summarize the facts relevant to the appeal. At approximately 4:00 P.M., on November 24, 2001, Donna Bergeron called 911 to report a fire in her house. A Lawrence fire department fire engine arrived on the scene. The victim, a Lawrence firefighter, was seated in the passenger seat of the fire engine's cab; the fire engine had pulled over to the "wrong" side of the road, so that the passenger door faced the road. As the victim opened the door of the cab, a green sport utility vehicle (SUV) struck him, pinning him between the SUV and the fire engine. The SUV then drove rapidly away from the scene, briefly dragging the victim, and leaving him on the street in front of the fire engine. The victim testified that, in total, his injuries required five surgeries, that he was unable to walk unassisted for approximately nine months after the accident, and that he required twenty months of rehabilitation. He has been unable to return to his old job and instead works at the Lawrence fire department's headquarters.

At trial, the Commonwealth called three witnesses who had observed the accident. The first of the witnesses saw the accident while driving behind the fire engine. He testified that he saw an SUV (which at the time he believed to be a black Toyota) "coming very fast" that "took a left right into the fireman." He

making a false statement to police and operating a motor vehicle with a suspended license, made at the close of the Commonwealth's case, were granted.

further testified that he pursued the SUV for a short distance, and wrote its license plate number on his hand.

The second of these witnesses was in her home when she heard sirens and looked out her window. She testified that she saw a green SUV pin the victim against the fire engine, almost tip over, and then continue down the middle of the street, hitting another vehicle soon afterwards. The third of these witnesses, Bergeron, the woman who initially called 911 to report the fire, saw the accident when she went outside her house after extinguishing the fire. She testified that she saw the driver of the SUV, described him as a "younger male, Hispanic, heavy, dark coat, baseball cap," and said that he appeared to be in his late twenties or early thirties.[2]

When police arrived at the scene to investigate, they obtained a description of the vehicle, and eventually found a dark green Mitsubishi Montero SUV abandoned near the accident scene. The driver's side door was open, the SUV had crash damage, and there was red paint on the vehicle and pieces of the victim's firefighting gear in and around it. The license plate number matched the one provided by the first witness, and a record search indicated that the vehicle was registered in the defendant's name.

At approximately 6:00 P.M. on the same day, the defendant entered a police station in Haverhill and told the two officers on duty that he had parked his vehicle in front of his house the previous night and, when he checked on it at 4:30 P.M. that day, the vehicle was missing. The Haverhill police officers became aware of the incident in Lawrence, and they told the defendant to go to Lawrence. When the defendant arrived at the Lawrence police station, at around 8:00 P.M., he was read his Miranda rights and questioned about his activities earlier in the day. The defendant told the police that the SUV had an alarm, which had been working the last time he drove the vehicle, at 10:00 P.M. the previous night, and which he had set after leaving the vehicle;

---

[2]She also testified that the SUV was traveling at "approximately 50 miles an hour" when it sped away after hitting the fire engine; the Commonwealth's expert witness testified that her investigation indicated that the fire engine had been struck by a vehicle traveling at twenty-six or twenty-seven miles per hour.

that he had only one set of keys to the vehicle; that no one had access to those keys; and that those keys were in his possession. The officer who interviewed him could not remember whether he had been shown the keys. The defendant said that he had been asleep in the afternoon in the front room of his apartment, which faced the street where his vehicle had been parked.

On the day after the accident, one of the officers met with Bergeron, the only witness who had seen the driver of the SUV, and displayed to her an eight-person photographic array. After a short time, she circled the picture of the defendant. The next day, an accident reconstructionist from the State police inspected the accident scene and the SUV, and noted during her investigation that the wire connecting the SUV's alarm system had been cut; the vehicle had a "passive alarm system" that engaged when the doors were shut. Because of the crash damage, the hood could not be opened. The reconstructionist testified that because of the crumpling of the front end of the SUV, there was a three- to five-inch gap under the hood. She testified that there was access through that gap to the area where the wire passed, and that one could have reached it if one knew what to look for. Another witness, a locksmith, testified that, once the alarm was activated, it would have gone off had anyone opened the doors, hatch, or hood of the vehicle.

The locksmith examined the vehicle's outside lock cylinders and steering column. He testified that he found no signs of tampering or forcing of the locks of the doors, and that there was a broken-off key in the ignition. The ignition cylinder was not the original, and he testified that a different key was required to unlock the doors and to turn on the ignition. He testified that the broken-off key had "been used over quite a period of time, which obviously means it wasn't a brand new key and it wasn't a newly duplicated key." In a subsequent search of the defendant's home pursuant to a warrant, no key was found.

At trial, defense counsel's chief argument was that the SUV had been stolen, and that the Commonwealth's evidence was not sufficient to establish beyond a reasonable doubt that the defendant was driving the SUV when it struck the fire engine and the victim.

2. *Opening statement and closing argument.* A. *Opening*

*statement.* The defendant claims that there was error in the prosecutor's opening statement. The defendant argues that the prosecutor misstated the evidence during his opening statement, when he said that one of the Haverhill police officers would testify that the defendant's clothing when he entered the police station matched the clothing that an eyewitness to the accident said the driver of the SUV wore. The eyewitness described the driver as wearing "[d]ark clothing and a baseball cap," and "dark coat, baseball cap." The officer testified only that, when the defendant entered the police station, he wore "a long sleeve shirt" and a red baseball cap, with a red fox on it. When the prosecutor asked if he was wearing light or dark colors, the officer said, "Honestly, I don't remember."

The defendant argues that the prosecutor's incorrect statement in his opening that the officer would directly corroborate the witness's description was reversible error. The Supreme Judicial Court has held, however, that the prosecutor may state in his or her opening anything the Commonwealth reasonably and in good faith expects to prove. *Commonwealth* v. *Qualls,* 440 Mass. 576, 586 (2003). "Absent a showing of bad faith or prejudice . . . the fact that certain evidence fails to materialize is not a ground for reversal." *Id.* The defendant has not shown bad faith here, and for all that appears on the record the prosecutor may simply have been unexpectedly faced with the officer's failure to remember the color of the defendant's clothing. Nor has the defendant shown this was prejudicial. The judge instructed the jury twice that opening statements are not evidence and that "if your memory, your collective memory is different from the attorneys as far as the facts are concerned, it's your memory that counts, not theirs."[3]

B. *Closing argument.* The defendant next contends that the

---

[3]The prosecutor's unobjected-to remarks in opening statement and closing argument that there was "no evidence" the SUV was broken into were also permissible. In the opening, the statement when read in context referred to the evidence of lack of tampering with the doors and the steering column. The statement in the closing was permissible in light of the Commonwealth's theory that the defendant had cut the alarm wire himself to "set the stage" for the claim that his vehicle had been stolen. "Prosecutors are entitled to argue theories supported by evidence and reasonable, possible inferences from the evidence." *Commonwealth* v. *Auclair,* 444 Mass. 348, 359 (2005).

prosecutor's closing contained improper elements. We agree that it did.

First, the prosecutor's repeated reference to the victim's status as a firefighter amounted to an improper appeal to the jury's sympathies. See *Commonwealth* v. *Smith*, 387 Mass. 900, 909-910 (1983). In eight pages of closing argument transcript, the prosecutor made reference nineteen times to the victim being a firefighter or his having been on a fire engine. Four times the prosecutor stated that the defendant "took out a firefighter"; the prosecutor stated further that the defendant "[left] behind a firefighter lying on the cold, wet street"; and he emphasized that "[t]his firefighter was trying to do his job" when the accident occurred.

The Commonwealth points out, correctly, that the victim's status as a firefighter was a necessary component of the charge of assault and battery on a public servant. However, the number and nature of the references to that status were excessive in the context of the argument, and amounted to an improper appeal to sympathy.

The prosecutor's repeated reference to the seriousness of the victim's injuries also went too far in appealing to juror sympathy. His closing included statements that the defendant "crushed Lieutenant Loughlin into Engine No. 8"; "mauled . . . and drove over" the victim; "crushed this firefighter's pelvis"; "drove into Lieutenant Loughlin with so much power he pinned him between two vehicles [so] that buttons from his uniform and his clothing were wedged into that vehicle. Then [the defendant] leaves the scene leaving behind a firefighter lying on the cold, wet street. . . ." He also said, "This firefighter ended up with injuries to his arms, to his wrist, to his legs, to his knees, to his pelvis. It took him over a year to walk again because this defendant slammed into him and then tried to flee the scene and he did flee the scene," and "[Y]ou have to imagine how much damage was done to that Lieutenant's body as that SUV tore into him."

All this occurred within a brief closing argument. In context, we conclude that it was excessive and amounted to an improper emotional appeal to the jury.[4] The Commonwealth urges that

---

[4]We also note that the prosecutor said in closing, "I suggest to you that as

the purpose of these statements was to explain why the defendant would have sought to "throw off suspicion," but this goes beyond anything necessary to make that point.

Second, we agree with the defendant that the prosecutor erred in the manner in which he defended the photographic array used by the police in their interview with the eyewitness. In his closing, defense counsel criticized the procedure of the photographic array itself. He reminded the jury that the eyewitness had testified that she thought at the time she was presented with the array that the police had a suspect,[5] and that she had expressed enthusiasm about catching the person who had caused the accident. He urged that it would only have been common sense to imagine that a picture of the suspect was included in the photographic array. He argued that the police instead should have used a sequential presentation of photographs. He argued that, with knowledge that the suspect was among the photographs in the array, her evaluation of it "became just a process of elimination." He went on:

> "Think about the effectiveness of presenting witness pictures one at a time. You show somebody pictures one at a time and they have to commit to an identification with each picture. They have to look at that picture and say, this is the person or this isn't the person. Or they may say, maybe it's the person. But they have to commit to an honest answer because they can't say, well, this is the person on the first photograph and then go to the third photograph and say, well, maybe this is the person because then you don't have an identification.

> "And this is something I really ask you to think about, that submitting the pictures one at a time is the way you're going to get an accurate identification if there is indeed one.

> "Now on the flip side, when you lay out eight pictures in

soon as he exited that vehicle, he cut the wire and screwed." While this statement was not necessarily helpful to the prosecution, it was not consistent with professional decorum.

[5]The witness's testimony about this appears to have occurred during a gap in the recording that is noted in the transcript. It was referred to later in a question by defense counsel and in closing argument.

front of someone and you have a witness who wants to catch the person, you have a witness that believes that the police suspect is included in that photo array, they're going to be tempted to try and pick a picture. It becomes like a multiple choice, just eight photographs. . . . [T]he best you're going to get at is the one person who looks most like or close to the person you saw."[6]

In defending the procedure used, the prosecutor stated in closing argument,

"Now, ladies and gentlemen, when you're in the middle of an investigation and you're trying to find the guy [who] took out a firefighter and then fled the scene, you want to move quickly on the investigation. Does it really make sense that an officer is going to come with a book full of photos and drop it in front of a person and say, take your time, look through these photos?

"And do you really think it would be fair to Mr. Rosa to go one photo at a time? Perhaps maybe Mr. Rosa's photo would be first. Do you think that would be fair to Mr. Rosa?

"The reality is, ladies and gentlemen, that eight picture photo array was more difficult than one at a time."

This argument was improper. "A prosecutor must limit comment in closing statement to the evidence and fair inferences that can be drawn from the evidence." *Commonwealth* v. *Kelly*, 417 Mass. 266, 270 (1994). There was no evidence introduced at trial regarding the relative accuracy of the two forms of photographic identification, something about which we express no opinion. Nor was there any evidence that the police here chose to use the photographic array method of identification out of fairness to suspects, or that their choice had anything to do with the

---

[6]In fact, the officer who showed the witness the photographic array testified that she read the witness instructions that stated, among other things, "You should not conclude or guess that the photographs contained in [*sic*] the picture of the person who committed the crime. You are not obligated to identify anyone. It is just as important to free the innocent person from suspicion as it is to identify the guilty parties."

exigencies of the investigation. In addition, "[i]mproper vouching occurs if 'an attorney . . . indicates that he or she has knowledge independent of the evidence before the jury.' " *Commonwealth* v. *Kee*, 449 Mass. 550, 560 (2007), quoting from *Commonwealth* v. *Ortega*, 441 Mass. 170, 181 (2004). The prosecutor's argument here could have been understood by the jury to indicate that the prosecutor had such knowledge about the relative difficulty of the two methods of identification and about the reasons that the police chose to use a photographic array in this instance.

The Commonwealth urges that this was "fair response" to defense counsel's argument.[7] But fair response must be "supported by inferences from the evidence." See *Commonwealth* v. *Grandison*, 433 Mass. at 143. The prosecutor did not simply urge based on the evidence that, for example, it was logical to conclude that the photographic array was accurate. He asserted that a photographic array is better than serial viewing of photographs, made statements that could have been understood to mean that the identification technique was chosen in order to avoid erroneous prosecutions based on mistaken identification, and suggested that the use of a book of photographs was somehow too cumbersome for a fast-paced investigation, although there is no evidence to support any of those contentions.[8]

C. *Assessment of substantial risk.* Although we have concluded there was error in the closing argument, there was no objection at trial.[9] The Supreme Judicial Court has explained that we may grant relief on the basis of errors that were not

---

[7]The Commonwealth also urges that the jury were instructed that the closing argument is not evidence. But that instruction cautioned jurors that their memory of the evidence should trump anything counsel said to the contrary in closing argument. It was irrelevant to the prosecutor's assertions with respect to the value of the Commonwealth's evidence.

[8]The Commonwealth does not suggest that defense counsel's argument was improper. If the prosecutor thought it was, however, the proper course would have been to object to it, which he did not do.

[9]We disagree with the defendant's other claims of error with respect to the closing argument. The prosecutor did not inject his personal belief in the defendant's guilt into his argument. The prosecutor may express his view of the strength of the evidence, as long as he does not "interject[] [any] extraneous material or belief," *Commonwealth* v. *Springer*, 49 Mass. App. Ct. 469, 475 (2000), quoting from *Commonwealth* v. *Smith*, 387 Mass. at 907, and the prosecutor may in closing argument draw inferences from the evidence. *Commonwealth* v. *Kozec*, 399 Mass. 514, 516 (1987). Read in context, the state-

objected to at trial only when, singly or together, they give rise to a substantial risk of a miscarriage of justice. "An error creates a substantial risk of a miscarriage of justice unless we are persuaded that it did not 'materially influence[]' the guilty verdict." *Commonwealth* v. *Alphas*, 430 Mass. at 13, quoting from *Commonwealth* v. *Freeman*, 352 Mass. 556, 564 (1967).

In this case, we conclude that the errors in the prosecutor's closing argument did not affect the verdict in this way. The Commonwealth had a very strong case. There was no doubt that the defendant's vehicle was used in the crime. The only question was whether he was driving. The evidence that the vehicle had not been stolen, which was the only other possibility suggested by any of the evidence, was almost irrefutable. Although the alarm wire was cut, the remaining physical evidence was inconsistent with the successful theft of the automobile. The defendant told police that he had control over the only key to the vehicle. The locksmith testified that, after disassembling the steering column, he recovered a broken-off key in the ignition, and that it was used and worn, giving rise to an inference that when the accident occurred, the vehicle had been started by the defendant's own key. The evidence demonstrated that neither

ments cited by the defendant, including the prosecutor's statement that "there is no question" the defendant was "the man behind the wheel," which was part of a broader discussion of the evidence, did no more than that.

Nor do we think the prosecutor's use of rhetorical questions could have been perceived in this case to shift the burden of proof to the defendant. Cf. *Commonwealth* v. *Habarek*, 402 Mass. 105, 110-111 (1988). The prosecutor was permissibly suggesting a fabrication in the defendant's story in a way the Supreme Judicial Court has described as an argument "based . . . on inferences that may be reasonably drawn from the evidence." *Commonwealth* v. *O'Connell*, 432 Mass. 657, 659-660 (2000), quoting from *Commonwealth* v. *Lawrence*, 404 Mass. 378, 391-392 (1989). Here, that argument was "within the prosecutor's right of retaliatory reply." *Commonwealth* v. *O'Connell*, *supra* at 660, quoting from *Commonwealth* v. *LeFave*, 407 Mass. 927, 939 (1990).

Finally, although the prosecutor's statement to the jury in closing that "the defendant's own investigator told you she was certain about the person that she picked out of that photo array" misstated the evidence — it was the Commonwealth's investigator — there was in this case no risk that it "misled the jury and created a substantial risk of a miscarriage of justice." *Commonwealth* v. *Thomas*, 400 Mass. 676, 683 (1987). Again, the judge instructed the jury that the closing was not evidence, the jury would have known that the only expert to testify during the two-day trial was the Commonwealth's, and the context indicates that this was nothing more than a slip of the tongue.

the door locks nor the ignition had been tampered with. And in a police search of the defendant's home, no key was found. Further, the eyewitness gave a description of the driver that matched that of the defendant, the vehicle's owner, to whom the rest of this evidence pointed, and then, even accepting for the sake of argument the possible comparative weakness of the method used by the police, the eyewitness picked the defendant out of a photographic array and identified him as the driver of the vehicle.

In light of the strength of the Commonwealth's case, we conclude that the errors in the prosecutor's closing argument could not have materially influenced the jury's guilty verdict.[10]

3. *Jury instructions.* Finally, there is no merit to the defendant's two claims of error in the judge's instructions to the jury. The defendant objects to this portion of the instructions:

> "You have to take a hard look at the evidence and not decide this case based on bias or prejudice. And you can't decide it based on sympathy. The injuries to Captain [*sic*] Loughlin were terrible. But you have to look at the facts in this case and decide the case on the facts before you and not be influenced by sympathy."

The defendant argues that the judge's characterization of the victim's injuries as "terrible" could have communicated to the jurors the message that they should, in fact, decide the case based on sympathy.

The point of the judge's statement, though, was precisely that the jury was not to decide the case based on sympathy. The single reference, without any elaboration, to the obvious fact that the injuries the jury had heard about were "terrible" does not convert an instruction not to be swayed by sympathy into one that could have been understood to call for the opposite. There was no error in this part of the instructions (and, therefore, contrary to the defendant's argument, no ineffectiveness in trial counsel's failure to object, see, e.g., *Commonwealth* v. *King,* 69 Mass. App. Ct. 113, 122 [2007]).

---

[10]This conclusion means that the defendant cannot succeed in his claim that his counsel was ineffective in failing to object to the errors. See *Commonwealth* v. *Randolph,* 438 Mass. at 296.

The defendant also argues that the trial judge's failure to instruct the jury, sua sponte, on the issue of consciousness of guilt created a substantial risk of a miscarriage of justice. It is well established that evidence of consciousness of guilt is, standing alone, insufficient to prove guilt; in a case like this, in which consciousness of guilt evidence is supported by other evidence and neither party seeks an instruction upon it, the question whether to give a consciousness of guilt instruction "is left to the sound discretion of the judge, and it will not be error if he or she chooses not to instruct on the subject in the absence of a request." *Commonwealth* v. *Simmons*, 419 Mass. 426, 436 (1995). See *Commonwealth* v. *Brousseau*, 421 Mass. 647, 652 (1996). "It necessarily follows that the judge's failure to give such an instruction did not create" a substantial risk of a miscarriage of justice. See *ibid.*

The judgments are affirmed.

*So ordered.*